**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FARHAD SHOAIE, *et al.*                    )
                                     )
               **Plaintiffs,**       )
v.                               )       No. 1:24-cv-01513 (GMH)
                                     )
ANTONY J. BLINKEN, *et al.*                )
                                     )
              **Defendants.**     )

## <u>MEMORANDUM OPINION</u>

Plaintiff Farhad Shoaie ("Plaintiff Shoaie") is a U.S. citizen and the petitioner of a Form I-130 *Petition for Alien Relative* seeking a family-sponsored immigrant visa on behalf of their[1] sibling, Plaintiff Faramarz Showaii, his wife, Hashemi Shirazi, and their minor children, B.D.S. and R.S.S. (collectively, "Applicant Plaintiffs"), who are Iranian nationals. On January 19, 2023, Applicant Plaintiffs were interviewed concerning their immigrant visa applications by the Consular Section of the U.S. Embassy in Ankara, Turkey. Shortly after the interview, Applicant Plaintiffs were notified that their visa applications were "refused" under the Immigration and Nationality Act Section 221(g) and subject to "administrative processing." As of the date of this Memorandum Opinion, Applicant Plaintiffs' visa applications have not overcome the Section 221(g) refusal.

Plaintiffs bring this suit to compel Defendant Antony J. Blinken, in his official capacity as U.S. Secretary of State, and Defendant Robert Jachim, in his official capacity as Acting Director of the Office of Screening, Analysis, and Coordination within the Department of State, to promptly adjudicate Applicant Plaintiffs' immigrant visa applications. Plaintiffs allege four causes of action arising under the Mandamus Act, 28 U.S.C. § 1361, and the Administrative Procedure Act

---

[1] It appears from the pleadings that Plaintiff Shoaie uses they/them pronouns.

("APA"), 5 U.S.C. §§ 555(b), 706(1), 706(2), generally claiming that the delay in processing Applicant Plaintiffs' visa applications is unreasonable and seeking an order compelling the government to adjudicate the applications within 21 days. Defendants filed a motion to dismiss three of the complaint's four counts under Fed. R. Civ. Proc. 12(b)(1) and 12(b)(6), arguing that Plaintiffs' claim that Defendants have failed to act on the visa applications in violation of the Mandamus Act (Count I) and/or have unreasonably delayed their adjudication under the APA (Counts II and IV) are deficient for two threshold reasons and fail to state a claim on the merits. Plaintiffs oppose the motion.

Upon thorough consideration of Defendants' motion and the record,[2] the motion to dismiss will be granted and Plaintiffs' claims for failure to act on the visa applications under the Mandamus Act (Count I) and for unreasonably delaying their adjudication under the APA (Counts II and IV) will be dismissed for failure to state a claim. Because Defendants' motion makes no argument to dismiss Count III of the complaint, which challenges as arbitrary and capricious under Section 706(2) of the APA Defendants' failure to issue the required number of family-sponsored preference category visas, it will not be dismissed.

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, authorizes consular offices to issue immigrant visas to foreign nationals seeking to enter the United States. *See* 8 U.S.C. § 1201; 22 C.F.R. § 42.71. One of the primary methods by which immigrants seek to enter the United States is through family-sponsored visas, including visas which may be issued to

---

[2] The docket entries relevant to this Memorandum Opinion are (1) the Complaint, ECF No. 1; (2) Defendants' motion to dismiss, ECF No. 6; (3) Plaintiffs' opposition, ECF No. 8; (4) Defendants' reply, ECF No. 9; and (5) Defendants' Notice of Supplemental Authority, ECF No. 7. Page numbers cited herein are those assigned by Court's CM/ECF system.

the sibling of a United States citizen. *See* 8 U.S.C. §§ 1151, 1153(a)(1)–(4). The sibling seeking a family-sponsored visa is considered a "principal applicant." 9 Foreign Affairs Manual ("FAM") 502.1-1(C)(1). The spouse and children of a principal applicant may be entitled to obtain a family-sponsored visa if accompanying the principal applicant or later joining the principal applicant in the U.S. *See* 8 U.S.C. § 1153(d) ("A spouse or child . . . shall, . . . be entitled to the same status, and the same order of consideration provided in the respective subsection, if accompanying or following to join, the spouse or parent."); 9 FAM 502.1-1(C)(2) (referring to the spouse or child of a principal applicant as a "derivative" applicant).

A family-sponsored immigrant visa application is initiated when a U.S. citizen files a Form I-130 *Petition for Alien Relative* with the United States Citizenship and Immigration Services ("USCIS"). *See Form I-130, Petition for Alien Relative* (June 3, 2024), https://www.uscis.gov/i-130 [https://perma.cc/M57W-Z8V2]. The I-130 form is intended to establish that the petitioner has a qualifying relationship with an eligible relative. *Id.* When the USCIS determines an eligible relationship exists, it "approves" the petition and forwards it to the U.S. Department of State's National Visa Center ("NVC"). U.S. Citizenship and Immigr. Servs., *I am a U.S. Citizen How do I help my relative become a U.S. permanent resident?* 2 (2013), https://www.uscis.gov/sites/default/files/document/guides/A1en.pdf [https://perma.cc/2SFA-P7KK]. The NVC keeps track of approved petitions and notifies the petitioner and the approved family members when it is time to submit a visa application and schedule an interview with the appropriate consulate office. *Id.* ("When [the] relative's place in line permits issuance of a visa number, the NVC will notify [petitioner] and [the] relative, inviting him or her and qualifying dependents to apply for immigrant visas.").

Every person applying for an immigrant visa must submit an application. *See* 22 C.F.R. § 42.63(a)(1) ("Every alien applying for an immigrant visa must make application, as directed by the consular officer, on Form DS-230, Application for Immigrant Visa and Alien Registration, or on Form DS-260, Electronic Application for Immigrant Visa and Alien Registration."). The INA places the burden of proof on the applicant to establish eligibility to receive a visa. 8 U.S.C. § 1361. Each applicant must pay a processing fee and submit supporting documentation, including an affidavit and certain police certificates. 9 FAM 504.1-2(b)(2). Once the application and supporting documents have been submitted and fees paid, the petition is "documentarily complete," and the applicants may schedule a consulate interview. *Id.* 504.1-2(d). Each applicant must appear before a consular officer to execute the application and undergo an interview. *See* 22 C.F.R. § 42.62(a) ("Every alien applying for an immigrant visa . . . shall be required to appear personally before a consular officer for the execution of the application . . ."); *id.* § 42.62(b) ("Every alien executing an immigrant visa application must be interviewed by a consular officer . . .").

Based on the applicant's representations during the interview and the executed visa application, the consular officer must determine "[t]he applicant's eligibility to receive a visa," *id.* § 42.62(b)(1)(ii), and "must either issue the visa or refuse it . . . ," 9 FAM § 504.9-2. Under the FAM, a consular officer "cannot temporarily refuse, suspend . . . or hold the visa for future action." 9 FAM § 504.9-2. Rather, as relvant here, "[w]hen a visa application has been properly completed and executed before a consular officer . . . , the consular officer must issue the visa, [or] refuse the visa under INA 212(a) or 221(g) or other applicable law . . . ." *See* 22 C.F.R. § 42.81(a); *see also* *id.* § 40.6 ("A visa can be refused only upon a ground specifically set out in the law or implementing regulations."). Under INA Section 221(g)—the statutory provision at issue here[3]—a consular

---

[3] Applicant Plaintiffs' visa applications were refused under INA Section 221(g). ECF No. 1-2 at 1.

officer shall refuse a visa if it appears that the application does not comply with the INA.  *See* 8 U.S.C. § 1201(g); 9 FAM 301.4-1(b)(14) (characterizing a Section 221(g) refusal as a refusal in which the "[a]pplication does not comply with the INA").  Specifically, a consular officer shall refuse a visa under INA Section 221(g) if (1) based on the application and the papers submitted therewith, the applicant is ineligible to receive a visa under Section 1182 of the INA, which identifies classes of inadmissible aliens; (2) the application itself fails to comply with the INA or its regulations; or (3) "the consular officer knows or has reason to believe that such alien is ineligible to receive a visa . . . under section 1182 [of the INA], or any other provision of law."  8 U.S.C. § 1201(g); *see also id*. § 1182.  Among other things, Section 1182 permits visas to be refused on health-related grounds, criminal-related grounds, and security-related grounds.  *See id.* § 1182(a)(1)–(10).  Further the FAM permits a consular officer to refuse a visa under Section 221(g) where "[t]he applicant fails to furnish information" necessary for the application or "[t]he application contains a false or incorrect statement."  9 FAM 302.1-8(B)(a).

Importantly, a refusal under Section 221(g) may be overcome.  *See* 9 FAM 403.10-4 ("[T]he applicant is entitled to present evidence to overcome a presumption or finding of ineligibility.  It is the policy of the U.S. Government to give the applicant every reasonable opportunity to establish eligibility to receive a visa."); *see also* 8 U.S.C. § 1361 ("If such person fails to establish to the satisfaction of the consular officer that he is eligible to receive a visa . . . no visa or other document required for entry shall be issued to such person, . . . *unless* he establishes to the satisfaction of the Attorney General that he is not inadmissible under any provision of this chapter." (emphasis added)).  For example, the FAM directs that a visa refused for failure by the applicant to furnish information "does not bar reconsideration of the application upon compliance by the applicant with the requirements of INA and the implementing regulations."  9 FAM 302.1-8(B)(b).

"[W]hen the applicant has presented additional evidence that allows [a consular officer] to re-open and re-adjudicate the case," the consular officer may do so. 9 FAM 403.10-4(B)(a). Similarly, a visa application may be refused under 221(g) "when the administrative processing on a case is" not complete and may be re-opened by the consular officer when it is concluded. *Id.*; *see also Sawahreh v. United States*, 630 F. Supp. 3d 155, 157 (D.D.C. 2022) (noting that a visa application may be refused by a consular officer under Section 221(g) "in order to allow for further administrative processing of an applicant's case if the officer needs more information or time to determine eligibility"). For this reason, a Section 221(g) refusal is often referred to, by both courts and consular officers, as a refusal subject to "administrative processing." *Vulupala v. Barr*, 438 F. Supp. 3d 93, 96 (D.D.C. 2020) (noting that when the plaintiff received his Section 221(g) refusal, the consulate "stat[ed] that his application was subject to further administrative processing"); *see also* 9 FAM 403.10-3(A)(5) ("INA 221(g) refusals require the applicant to wait for the results of additional administrative processing . . . ."); 9 FAM 403.10-3(A)(2)(2)(b) ("For an INA 221(g) . . . refusal, . . . the letter must . . . [n]ot state that the denial is 'pending', 'temporary', or 'interim' or that the case is suspended, although it may reference further administrative processing of the case . . . .").

    **B.**    **Factual Background**

Applicant Plaintiffs are citizens of Iran seeking to enter the United States on a family-sponsored immigrant visa. ECF No. 1, ¶¶ 27–29. On August 23, 2006, Plaintiff Shoaie filed a Form I-130 on behalf of Applicant Plaintiffs. *Id.*, ¶ 1. The petition was approved and forwarded to the NVC on December 9, 2010. *Id.* On May 6, 2019, Applicant Plaintiffs paid the required filing fees and filed a Form DS-260 and supporting documents. *Id.*, ¶ 2. The NVC found that Applicant Plaintiffs were documentarily qualified, and thereafter Applicant Plaintiffs were notified that they

were eligible to schedule a consular interview.  *Id.*, ¶¶ 4, 99.  On January 19, 2023, Applicant Plaintiffs were interviewed by the Consular Section of the U.S. Embassy in Ankara, Turkey.  *Id.*, ¶ 5.  That same day, Applicant Plaintiffs were given a letter notifying them that their applications were "refused under section 221(g)."  ECF No. 1-2 at 1.  Applicant Plaintiffs were further notified that their applications were subject to "administrative processing."  *See* ECF No. 1, ¶ 100 ("Applicant-Plaintiffs' cases were placed in administrative processing[.]"); *see also* ECF No. 1-2 at 1 (checking the box in the refusal letter next to "Administrative Processing: We will contact you by e-mail when your processing is completed.").  On January 23, 2023, Applicant Plaintiffs were asked to provide supplemental information, which they submitted on February 6, 2023.  ECF No. 1, ¶¶ 101–102.  Since then, Applicant Plaintiffs' applications have remained in "administrative processing"—a period totaling, as of the date of this opinion, approximately twenty months.  *Id.*, ¶¶ 100, 103; *see also* ECF No. 1-1 at 1 (showing the Plaintiff's online case status as "refused").

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(1)

A motion to dismiss for lack of jurisdiction concerns a court's ability to hear a particular claim and proceeds under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 12(b)(1).  "In deciding a motion to dismiss challenging the Court's subject-matter jurisdiction under Rule 12(b)(1), a court must 'accept as true all of the factual allegations contained in the complaint' and draw all reasonable inferences in favor of the plaintiff."  *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011) (quoting *Brown v. District of Columbia,* 514 F.3d 1279, 1283 (D.C. Cir. 2008)).  But courts are "not required . . . to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations."  *Id.* (alteration in original) (quoting *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001)).  In addition, "a court 'may

consider such materials outside the pleadings as it deems appropriate to resolve the question whether it has jurisdiction to hear the case." *O'Gilvie v. Corp. for Nat'l Cmty. Serv.*, 802 F. Supp. 2d 77, 80 (D.D.C. 2011) (quoting *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)).

### B.    Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint on the basis that it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A court reviewing a Rule 12(b)(6) motion must accept as true the well-pleaded factual allegations contained in the complaint, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009), and construe those allegations "in the light most favorable to the plaintiff[]," *Vick v. Brennan*, 172 F. Supp. 3d 285, 295 (D.D.C. 2016). While the plaintiff need not make "detailed factual allegations" to avoid dismissal, he or she must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To meet this standard, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In addition to the allegations of the complaint, a court evaluating a motion under Rule 12(b)(6) may also consider "any documents either attached to or incorporated in the complaint[] and matters of which [the court] may take judicial notice." *Vasaturo v. Peterka*, 177 F. Supp. 3d 509, 511 (D.D.C. 2016) (second alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).

### III.    DISCUSSION

Defendants move to dismiss on three grounds, arguing that (1) the doctrine of consular nonreviewability bars judicial review; (2) Plaintiffs have not stated a mandatory, non-discretionary duty to act; and (3) Plaintiffs have not stated a claim for unreasonable delay under the APA.  ECF No. 6 at 8–9.  As explained below, the Court need not resolve issues (1) and (2) because Plaintiff fails to state a claim for unreasonable delay as a matter of law.

### A.    The Court need not determine whether the doctrine of consular nonreviewability bars judicial review.

Defendants argue that their action (or lack thereof) with respect to Applicant Plaintiffs' visa applications is not subject to judicial review under the consular nonreviewability doctrine because a Section 221(g) refusal is a final agency action.  *See* ECF No. 6 at 8–9, 12–17.  Plaintiffs argue there has been no final adjudication because their application is still pending "administrative processing", and therefore the consular nonreviewability doctrine does not apply.  *See* ECF No. 8 at 26, 31–32.

"The doctrine of consular nonreviewability prevents a federal court from second-guessing a United States consular officer's decision to issue or withhold a visa."  *Baan Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1023 (D.C. Cir. 2021); *see also Dep't of State v. Muñoz*, __ U.S. __, __, 144 S. Ct. 1812, 1820 (2024) ("The [INA] does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions."); *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 2021) (noting that Congress may "expressly authoriz[e] judicial review of consular officers' actions," but Congress has not yet authorized such review).  This doctrine arises from the policy concerns associated with foreign relations, matters normally left to the political branches of government.  *See Saavedra Bruno*, 197 F.3d at 1159 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the

conduct of foreign relations, the war power, and the maintenance of a republican form of government." (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952)). This doctrine also derives in part from the INA's broad grant of discretion to consular officers to issue or refuse visa applications. *See id.* at 1158 n.2 ("Consular officers have complete discretion over issuance and revocation of visas.); 8 U.S.C. §§ 1104(a), 1201(a)(1), (i).

Judges on this court have consistently held that the doctrine of consular nonreviewability does not apply to review of visa applications that have been refused under Section 221(g), finding that such refusal is not a final agency action. *See, e.g.*, *Al-Gharawy v. U.S. Dep't of Homeland Sec.*, 617 F. Supp. 3d 1, 16 (D.D.C. 2022) (finding that the consular nonreviewability doctrine did not apply because "the factual allegations in the complaint . . . indicate that no final decision has been made"); *Vulupala*, 438 F. Supp. 3d at 99 ("[T]he Court finds that the doctrine of consular nonreviewability, which precludes review of a *final* decision by a consular official, does not apply . . . ."); *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 11 (D.D.C. 2017) (noting that the consular nonreviewability doctrine does not apply to visa applications placed in administrative processing). Since Section 221(g) refusals are subject to "administrative processing," these courts have reasoned that such visa applications are "provisionally refused pending a final decision." *Al-Gharawy*, 617 F. Supp. 3d at 11. Thus, they have held that the consular nonreviewability doctrine does not bar review of such actions.

Until recently, this Court would have followed that well-established line of authority and found that a refusal under Section 221(g) was not final and not subject to the consular nonreviewability doctrine. But Defendants argue that a recent unpublished decision issued by the D.C. Circuit casts doubt on past reasoning and is dispositive of the case. *See Karimova v. Abate*, No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024).

In *Karimova*, the court of appeals explicitly held that a Section 221(g) refusal is a final decision. *See id.* at *4 ("Karimova's 'matter' has already been 'conclude[d].'" (alteration in original) (quoting 5 U.S.C. § 555(b))). The court described the visa application procedure as follows:

> Visa applicants "make" or "execute" their application by bringing the required paperwork to an in-person interview with a consular officer. 9 Foreign Affairs Manual ("FAM") § 504.1-3(a), (g). The consular officer's decision to refuse or grant the application is based on that interview and the application materials. *Id.* § 504.1-3(f). As relevant here, once the applicant properly applies, the consular officer—by regulation—"*must* issue" or "refuse" the visa. 22 C.F.R. § 42.81(a) (emphasis added); *see* 9 FAM § 504.1-3(g) ("Once an application has been executed, [the consular officer] must either issue the visa or refuse it."). Consular officers "cannot temporarily refuse, suspend, or hold the visa for future action" at that point. 9 FAM § 504.1-3(g); *id.* § 504.9-2. There are no exceptions to this rule relevant to this case. *Id.* § 504.1-3(i)(1); *id.* § 504.11-2(A)(a).
>
> So any applicant "to whom a visa is not issued by the end of the working day on which the application is made, or by the end of the next working day must be found ineligible[.]" 9 FAM § 504.1-3(i)(1); *id.* § 504.11-2(A)(a). The "requirement to find an applicant ineligible when a visa is not issued applies even when" more information might show the applicant to be eligible. *Id.* § 504.1-3(i)(1). "There is no such thing as an informal refusal or a pending case once a formal application has been made." *Id.* § 504.1-3(i); *id.* § 504.11-2(A)(b); *see* 22 C.F.R. § 42.81(a).

*Id.* at *1–2. The court reasoned that, since the rules do not allow for an "informal" refusal and require a consulate officer to either issue or refuse the visa by the end of the working day on which the application is made, any refusal made directly after a consulate meeting must be final. *Id.* at *2. Instead of characterizing a Section 221(g) refusal as a "provisional" refusal, *Al-Gharawy*, 617 F. Supp. 3d at 11, the court characterized the mechanism as a way for a consular officer to collect additional information on the applicant and choose to *sua sponte* re-open and re-adjudicate the applicant's case if enough information is found. *Karimova*, 2024 WL 3517852, at *2. The court reasoned that, "[u]nless and until that happens, . . . the visa application remains officially refused." *Id.*

If *Karimova* is binding on this Court, Defendants would be correct that it is dispositive of the issue. But because it is an unpublished decision, it is unclear how, and to what degree, this Court should find *Karimova* precedential.

Two local appellate rules guide the Court's analysis but, unfortunately, are conflicting. *See* D.C. Cir. Rule 32.1(b)(1)(B); D.C. Cir. Rule 36(e)(2). Rule 32.1(b) distinguishes between unpublished dispositions entered before January 1, 2002, which "are not to be cited as precedent," D.C. Cir. Rule 32.1(b)(1)(A), and unpublished decisions entered after January 1, 2002, which "may be cited as precedent." D.C. Cir. Rule 32.1(b)(1)(B); *see also* Fed. R. App. P 32.1(a) ("A court may not prohibit or restrict the citation of federal judicial opinions . . . designated as 'unpublished,' . . . and . . . issued on or after January 1, 2007."). But, although unpublished opinions *may* be cited as precedent, D.C. Circuit Rule 36(e)(2) states that "a panel's decision to issue an unpublished disposition means that the panel sees no precedential value in that disposition." D.C. Cir. Rule 36(e)(2).

Judges on this court have tackled the juxtaposition of these rules before but have never conclusively found that unpublished opinions entered by a D.C. Circuit panel are binding. *See, e.g., Aliva v. Dailey*, 246 F. Supp. 3d 247, 362 n.6 (D.D.C. 2017) (finding an unpublished decision entered in 2002 nonprecedential because FRAP 32.1 "differentiates between unpublished opinions issued before and after January 1, 2007, prohibiting a court from restricting citation to the latter but not the former"). Nor has the D.C. Circuit clearly held that its unpublished decisions are binding precedent. *See Verizon v. FCC*, 770 F.3d 961, 968 n.11 (D.D.C. 2014) (noting the tension between D.C. Cir. R. 32.1(b)(1) and 36(e)(2) and citing an unpublished decision "for its persuasive authority, and adopt[ing] its dicta as a holding"); *Head v. Wilson*, 792 F.3d 102, 109 & n.9 (D.D.C. 2015) (refusing to rely on an unpublished opinion entered before 2002 as precedent but noting, *in*

*dicta*, that unpublished opinions entered after January 1, 2002 "may be cited as precedent" despite the language of Rule 36(e)(2)).  Defendant relies on *Khaksari v. Chairman, Broad Board of Governors*, 451 F. App'x 1, 4 (D.C. Cir. 2011), in which the D.C. Circuit noted that an unpublished decision "has the force of precedent," citing Rule 32.1(b)(1)(B).  *See* ECF No. 9 at 8–9.  But *Khaksari* is itself an unpublished decision, making reliance on it questionable for the same reason that *Karimova*'s precedential value is doubtful.  The other cases Defendant cites merely discuss the precedential value with which the D.C. Circuit treats its own unpublished decisions—i.e., they are non-binding on future panels of the court.  *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) ("[U]npublished dispositions should not strictly bind panels of the court.  In our view, the weight afforded an unpublished disposition of this court should be similar to that which the Supreme Court grants to its own dismissals for want of a substantial federal question or summary affirmances.  While these dispositions have some precedential value they are obviously . . . not of the same precedential value as would be an opinion of this court treating the question on the merits." (footnote omitted)).  Those cases do not address whether unpublished panel decisions should be deemed binding on the district court.

When considering the precedential value of *Karimova* specifically, judges on this court have come to differing conclusions.  In *Hajizadeh v. Blinken*, the court found that *Karimova* was not "controlling" because it was "an unpublished disposition," citing D.C. Circuit Rule 36(a)(2).  No. 23-1766, 2024 WL 3638336, at *3 n.3 (Aug. 2, 2024).  In *Ibrahim v. Spera*, on the other hand, the court found that "the decision in *Karimova* requires the dismissal of [a Section 221(g) refusal and placement in administrative processing] action" without discussing *Karimova*'s precedential value as an unpublished decision.  No. 23-3563, 2024 WL 4103702, at *1 (D.D.C. Sept. 6, 2024).

All of which is to say, there are differing opinions on the precedential value of unpublished D.C. Circuit decisions generally, and on *Karimova* specifically. As other courts have done, the Court finds it need not conclusively determine the extent that *Karimova* upends prior reasoning because the Plaintiffs' claim of unreasonable delay fails on the merits.[4] *See, e.g.*, *Sharifishourabi v. Blinken*, No. 23-cv-3383, 2024 WL 3566226, at *13–14 (D.D.C. July 29, 2024) (noting that *Karimova* "casts doubt" on the accuracy of the reasoning of prior decisions on this issue, but finding it "need not conclusively determine the extent to which [it] disrupts prior decisions" because it determined that dismissal was appropriate on the merits).

### B.    The Court assumes Plaintiffs have stated a non-discretionary duty.

Next, Defendants argue that Plaintiffs have not stated a non-discretionary duty entitling them to relief under either the APA or the Mandamus Act.

A plaintiff may proceed under either the APA or the Mandamus Act based on a claim of an agency's unreasonable delay. *See* 5 U.S.C. § 706(1) (granting the reviewing court authority to "compel agency action unlawfully withheld or unreasonably delayed."); 28 U.S.C. § 1361 (granting district courts the jurisdiction to compel "any agency . . . to perform a duty owed to the plaintiff"). Here, Plaintiffs proceed under both. ECF No. 1 ¶¶ 17–18, 146, 159–161, 173–175.

"Mandamus is an 'extraordinary remedy, reserved only for the most transparent violations of a clear duty to act.'" *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (quoting *in re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)). To obtain a writ of mandamus, a petitioner must show, among other things, "that the agency has violated 'a

---

[4] Whether the doctrine of consular nonreviewability bars judicial review is a nonjurisdictional threshold question. *See Muñoz*, __ U.S. __, __ n.4, 144 S. Ct. at 1820 n.4 ("[T]he doctrine of consular nonreviewability is not jurisdictional . . ."); *see also Baan Roa Thai Rest.*, at 1023 ("As recently clarified by the United States Supreme Court, . . .a dismissal pursuant to the consular nonreviewability doctrine is a dismissal on the merits."). As such the Court may assume without deciding that the plaintiffs' claims are reviewable. *See, e.g.*, *Muñoz*, __ U.S. __, __ n.4, 144 S. Ct. at 1820 n.4.

crystal-clear legal duty.'" *Id.* (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022)).  Similarly, to proceed with an APA claim for unreasonable delay, a plaintiff must allege that an agency has "failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).  Therefore, to proceed under either the APA or the Mandamus Act on a claim of unreasonable delay, a plaintiff must allege "that an agency has a clear non-discretionary duty to take a specific action and that the agency failed to take that action." *Sharifishourabi*, 2024 WL 2566226, at *5; *see also Norton*, 542 U.S. at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law).").  The authority under either statute "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act[]' . . . without directing *how* it shall act." *Norton*, 542 U.S. at 63 (quoting Att'y Gen.'s Manual on the Admin. Proc. Act 108 (1947)).

Plaintiffs allege that Defendants have a mandatory duty to adjudicate Applicant Plaintiffs' visa applications within a reasonable time, relying on the APA, the INA, and regulations and agency guidance issued to implement the INA.  ECF No. 1, ¶¶ 8, 23, 75–84, 122.  Plaintiffs first point to Section 555(b) of the APA which provides: "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).  Plaintiffs similarly point to rules issued pursuant to the INA, which require the State Department and/or consular officer to resolve all visa applications.  *See* 22 C.F.R. § 41.106 ("Consular officers must ensure that the Form DC-160 or, alternatively, Form DS-156 is properly and promptly processed in accordance with the applicable regulations and instructions."); *Id.* § 42.81(a) ("When a visa application has been properly completed and executed before a consular officer in accordance with the provisions of

INA and the implementing regulations, the consular officer must either issue or refuse the visa."); *id.* § 42.62(b) (requiring every immigrant visa applicant to "be interviewed by a consular officer who shall determine . . . [t]he applicant's eligibility to receive a visa"). Additionally, Plaintiffs cite sections of the INA defining how and how many immigrant visas shall be issued. *See* 8 U.S.C. § 1101(a)(9) (defining "consular officer" as an "officer or employee of the United States desig-nated . . . for the purpose of issuing immigrant or nonimmigrant visas"); *id.* § 1151(c)(1)(B)(ii) (detailing the number of family-sponsored immigrant visas that "shall" be issued in each fiscal year).

Again, Defendant points to *Karimova* as dispositive on this issue. ECF No. 7 at 3. The *Karimova* Court held that Section 555(b) of the APA does not impose a clear duty to act on a consular officer. *See Karimova*, 2024 WL 3517852, at *3–4. The court reasoned that Section 555(b) "simply expresses 'a congressional view that agencies should act within reasonable time frames'" and this "general, good-governance principle[]" does not alter the broad discretion con-sular officers have to adjudicate visa applications. *Id.* (quoting *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) [hereinafter *TRAC*]) But the court's conclusion hinged on the reasoning that any duty required under Section 555(b) would not apply to matters that have already been concluded. *Id.* Because *Karimova* had already determined that a refusal under Section 221(g) was a final refusal, it concluded that the plaintiff had not stated a duty under the APA. *Id.* at *4.

Again, this reasoning rebuts a long line of decisions finding that a duty exists under Section 555(b). *See, e.g.*, *Arab v. Blinken*, 600 F. Supp. 3d 59, 68 (D.D.C. 2022) (relying on § 555(b) as imposing a duty to act); *see also Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 338 (D.C. Cir. 2023) (same). As detailed above, it is unclear whether *Karimova*—an unpublished Circuit

court decision—is binding on this Court. Further, Plaintiffs have pleaded a series of duties under the INA and its implementing regulations and guidelines, which may constitute mandatory duties, and which were not considered by the *Karimova* Court. As such, and without commenting on the precedential value of *Karimova*, this Court, like others, will assume in Plaintiffs' favor that they have pleaded a clear, non-discretionary duty under either the APA or INA to adjudicate all visa applications within a reasonable time.[5] *See, e.g.¸ Sharifishourabi*, 2024 WL 3566226, at *6 (assuming that the complaint identifies a clear duty under the INA and noting that the court "need not scour" the complaint to find a duty because the claims fail on the merits); *Giza v. Blinken*, No. 20-cv-1641, 2024 WL 3967284 (D.D.C. Aug. 27, 2024) ("Because the [plaintiffs] 'fail[] to allege an unreasonable delay as a matter of law, the Court will assume, without deciding, that the State Department has a non-discretionary, discrete duty to adjudicate [their] visa application[s].'" (second through fourth alterations in original) (quoting *Baygan*, 2024 WL 3723714, at *5)).

## C.    Plaintiffs have not sufficiently stated a claim for unreasonable delay under the APA.

Pursuant to the APA, an agency shall, "within a reasonable amount of time . . . conclude a matter presented to it." 5 U.S.C. § 555(b). If an agency "fail[s] to do so, [a] court[ ] may 'compel agency action unlawfully withheld or unreasonably delayed.'" *Desai v. U.S. Citizenship &*

---

[5] Whether Plaintiffs have stated a non-discretionary duty to act under the APA appears to be nonjurisdictional issue. *See, e.g.*, *Giza v. Blinken*, No. 23-cv-1641, 2024 WL 3967284, at *4 (D.D.C. Aug. 27, 2024) ( "assum[ing], without deciding, that the State Department has a non-discretionary, discrete duty to adjudicate" in a case compelling action under the APA); *Baygan v. Blinken*, No. 23-cv-2840, 2024 WL 3723714, at *5 (D.D.C. Aug. 8, 2024) (same). However, Defendants argue that pleading a non-discretionary duty under the Mandamus Act *is* jurisdictional, citing *American Hospital Ass'n v. Burwell*. ECF No. 6 at 18; *see Am. Hosp. Ass'n*, 812 F.3d 183, 189 (D.C. Cir. 2016) ("These three threshold requirements [including a clear duty to act] are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction."). The Court disagrees. Although the D.C. Circuit in *Burwell* noted that "the distinction between the jurisdictional inquiry and the equitable merits inquiry matters," it did not conclusively state that an analysis of the jurisdictional factors *must* be resolved prior to an analysis of whether an agency's delay is sufficiently egregious to warrant mandamus relief using the so-called *TRAC* factors. *Burwell*, 812 F.3d at 190. Instead, the *Burwell* court noted that the D.C. Circuit has "never squarely addressed the interplay of the three threshold mandamus requirements . . . and the six *TRAC* factors[,]" noting that "in situations where plaintiffs allege that agency delay is unreasonable despite the absence of a specific statutory deadline, the entire *TRAC* factor analysis may go to the threshold jurisdictional question: does the agency's delay violate a clear duty?" *Id.* at 190–91.

*Immigr. Servs.*, No. 20-cv-1005, 2021 WL 1110737, at *4 (D.D.C. 2021) (quoting 5 U.S.C. § 706(1)).  That is, the statute "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,' and authorizes a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed.'"  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003) (citations omitted) (quoting 5 U.S.C. §§ 555(b), 706(1)).  Mandamus claims that rest on unreasonable agency delay turn on "whether the agency's delay is so egregious as to warrant mandamus."  *Am. Hosp. Ass'nl*, 812 F.3d at 189; *see also In re Core Commc'ns., Inc.*, 531 F.3d 849, 855 (D.D.C. 2008) ("The central question in evaluating 'a claim of unreasonable delay' is 'whether the agency's delay is so egregious as to warrant mandamus." (quoting *TRAC* 750 F.2d at 79).  "The standard by which a court reviews this type of agency inaction is the same under both . . . the APA and the Mandamus Act."  *Skalka v. Kelly*, 246 F. Supp. 3d 147, 152 (D.D.C. 2017).  In *TRAC*, the D.C. Circuit laid out six principles that offer "useful guidance" for analyzing claims of unreasonably delayed agency action.  *TRAC*, 750 F.2d at 80.  The *TRAC* factors are as follows:

(1)  the time agencies take to make decisions must be governed by a "rule of reason";

(2)  where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3)  delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4)  the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)  the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6)  the court need not "find any impropriety lurking behind agency lassitude in order to hold that the agency action is 'unreasonably delayed.'"

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*, 750 F.2d at 80).[6]  To survive a motion to dismiss, a plaintiff must allege facts in the complaint to state a plausible claim of unreasonable delay under the *TRAC* factors.  *See Da Costa*, 80 F.4th at 339.  Determination of whether a delay is unreasonable must not be made in a vacuum but must consider the totality of the circumstances presented to the court.  *See, e.g.*, *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102 (remanding for a "full and fresh evaluation" considering "the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency").  The following discussion addresses each of the *TRAC* factors, although in a different order than set out above.

### 1.  *TRAC* Factors One and Two—the Agency's Rule of Reason

The first two *TRAC* factors, which are "typically considered together," *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 317 (D.D.C. 2020), "get at whether the agency's response time complies with an existing specified schedule and whether it is governed by an identifiable rationale," *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014); *see also Da Costa*, 80 F.4th at 340 ("As for *TRAC* factor one, 'the time agencies take to make decisions must be governed by a 'rule of reason.'"); *TRAC*, 750 F.2d at 80.  "In assessing whether an agency follows a rule of reason, we evaluate the length of the delay in light of 'the complexity of the task at hand, the

---

[6] Plaintiff argues that resolving the issue of unreasonable delay prior to discovery is not appropriate.  *See* ECF No. 8 at 44.  The D.C. Circuit has stated that "[r]esolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court."  *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100. This reasoning has led some courts to decline to evaluate claims of unreasonable delay at the motion-to-dismiss stage and allow parties to engage in discovery. *See, e.g.*, *Addala v. Renaud*, No. 20-cv-2460, 2021 WL 244951, at *3 (D.D.C. Jan. 25, 2021); *Thomas v. Pompeo*, 438 F. Supp. 3d 35, 44 (D.D.C. 2020). A significant number of other cases, however, have proceeded to address the *TRAC* factors prior to discovery, noting that "[i]n applying [the *TRAC*] factors, the [c]ourt is not determining whether there has been an unreasonable delay; rather, it is determining whether plaintiffs' complaint has alleged facts sufficient to state a plausible claim for unreasonable administrative delay."  *Ghadami v. DHS*, No. 19-cv-397 (ABJ), 2020 WL 1308376, at *7 n.6 (D.D.C. Mar. 19, 2020).  The Court finds that this case is appropriate for adjudication prior to discovery.

significance (and permanence) of the outcome, and the resources available to the agency.'" *Da Costa*, 80 F. 4th at 340 (quoting *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102). Additionally, courts will consider whether the procedure is informed by a specific timetable established by Congress, in line with the second *TRAC* factor. *See TRAC*, 750 F.2d at 80. "[A]bsent a precise statutory timetable or other factors counseling expeditious action, an agency's control over the timetable . . . is entitled to considerable deference." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Sierra Club v. Gorsuch*, 715 F.2d 653, 658 (D.C. Cir. 1983)).

Defendants argue primarily that "agencies [have] wide discretion in the area of immigration processing," that they process visa applications based on a rule of reason, and that the alleged delay here "is shorter than what courts in this District have routinely concluded does not constitute unreasonable delay." ECF No. 6 at 28 (quoting *Skalka*, 246 F. Supp. 3d at 153–54). Relying on the Declaration of Carson Wu, former Director of Screening, Analysis and Coordination within the Department of State ("SAC"), ECF. No. 1-6, Plaintiffs argue primarily that Defendants' timeline lacks a rule of reason because Defendants have not established that there is a queue for visa applications and "administrative processing [of] [Security Advisory Opinions ("SAOs") on flagged visa applications] are *NOT* addressed or resolved in a first-in-first-out basis," ECF No. 8 at 47–48 (emphasis in original). *See also* ECF No. 1-4 at 5.

The Wu declaration provides the Court with helpful understanding of how and within what timelines visa applications that are refused under Section 221(g) are processed by SAC. *See generally* ECF No. 1-6. The declaration describes the process as follows: "When automated processes or the determination of a consular officer indicate a possible match between a visa application and derogatory information . . . [a]n interagency process is launched." *Id.* at 2; *see also id.* at 2–3

(describing the automated processes used by consular offices to flag visa applications). "If derogatory information exists about an applicant, the consular officer receives a 'red-light' response . . . [and] the consular officer is required to take prescribed steps necessary to assess properly whether the applicant has incurred a ground of visa ineligibility. If the ground of ineligibility implicated . . . relates to security-related grounds . . . the officer is required to refuse the application under INA section 221(g)." *Id.* at 3. At that point, the consular officer is required to submit the application to the SAC for an analyst to provide an SAO on the flagged visa application. *Id.* at 4. The SAC has 22 analysts in the Counterterrorism Division and fifteen analysts in the Screening Division, who handle approximately 55,000 and 75,000 SAO requests annually, respectively. *Id.* "[C]ompletion of SAO responses depends on the extent of review and coordination required, the amount of derogatory information, which other agencies have responsive information, the timing of when each partner agency completes its review, and a variety of other factors. . . . Because of the complexity of this process, SAO requests can be neither addressed nor resolved in a first-in-first-out basis." *Id.* at 5. Considering the "complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency," *Da Costa*, 80 F.4th at 340, it is clear to the Court that Defendants have a plan in place to adjudicate SAO requests, that the process, albeit complicated, operates based on a rule of reason, and that establishing a required timeframe for the adjudication of an individual request is necessarily difficult—all of which weigh in favor of Defendants under the first *TRAC* factor.

Plaintiffs point to 8 U.S.C. § 1571(b) to establish a mandatory timeframe to complete such adjudications: "It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." *See* 8 U.S.C. § 1571(b). State Department policy guides have also stated that family-based category immigrant

21

visa applications should be prioritized, and all applications should be resolved within a 60-day window. *See* 9 FAM 504.7-2(b) (stating that the state department is required to "establish a policy" in which all family-based immigrant visas (other than fiancé visas) be processed within 60 days). But judges in this district have determined such timelines are merely precatory. *See, e.g.*, *Mashaghzadehfard v. Blinken*, No. 23-cv-3164, 2024 WL 4198689, at *4 (D.D.C. Sept. 16, 2024). The language used in both the Congressional timeline and the agency's internal timeline supports the consensus that the timelines are permissive goals, rather than mandatory rules. *See* 8 U.S.C. § 1571 (using "should"); *See* 9 FAM 504.7-2(b) (and notes that "[t]he Department expects all [im-migrant visa] united to *strive* to meet the []60-day requirements" (emphasis added)). As such, and as other judges in this district have found, the Department has broad discretion over *when* such visa adjudications must be made. *See Beshir v. Holder*, 10 F. Supp. 3d 165, 176 (D.D.C. 2014) ("The absence of a congressionally-imposed deadline or timeframe . . . supports the conclusion that the pace of adjudication is discretionary . . . ."); *Salka*, 246 F. Supp. 3d at 153–54 ("Congress has given the agencies wide discretion in the area of immigration processing.").

Plaintiffs have been waiting approximately 20 months, at the time of the issuance of this opinion, since they received the Section 221(g) refusal.[7] They point to *In re American Rivers &*

---

[7] The parties disagree on the timeline the Court should be examining. Plaintiffs argue it should start either from the submission of the DS-260 form (over 63 months ago) or from the submission of the 1-130 Petition (over 215 months ago). *See* ECF No. 8 at 14, 16, 50–51. Defendants argue it should start at the point of the last agency action; i.e., the refusal after the Applicant Plaintiffs' consular interview on January 19, 2023 (approximately 20 months ago). ECF No. 9 at 18 ("The entirety of Plaintiffs' arguments regarding TRAC Factors One and Two boil down to the time elapsed since the Department refused their applications."). Courts in this district have typically analyzed unreasonable delay based on the timeline Defendants suggest—beginning at the last agency action. *See, e.g.*, *Dalmar v. Blinken*, No. 23-cv-3315, 2024 WL 3967289, at *5 (D.D.C. Aug. 26, 2024) ("[T]he clock starts with 'the last agency ac-tion' . . . ." (quoting *Barazandeh v. U.S. Dep't of State*, No. 23-cv-1581, 2024 WL 341166, at *7 n.7 (D.D.C. Jan. 30, 2024))). Further, the Court finds that this is the most appropriate time period to measure because the delay complained of by Plaintiffs is that caused by the period of "administrative processing," which began at the time of the last agency action following Applicant Plaintiffs' consular interview. *See* ECF No. 1, ¶ 6 ("Following their interview, Appli-cant-Plaintiffs' cases were placed in administrative processing, where it has remained indefinitely since that time."); *id.*, ¶ 14 (noting that Defendants have "improperly withheld action on [the application]" for "over 15 months"); ECF No. 8 at 16 ("At the end of the interview, Applicant-Plaintiffs' cases were placed in administrative processing, where it has remained indefinitely since that time.").

*Idaho Rivers United* to argue that this delay is patently unreasonable. *See* ECF No. 1, ¶ 179. There, the D.C. Circuit observed that "[r]easonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). That case did not consider the delay in processing immigrant visa applications, however, but rather the delayed completion of duties required under the Endangered Species Act by the Federal Energy Regulatory Commission. *Id.* at 414, 418–19. In the context of immigrant visa applications, courts in this Circuit have often found that a delay under two years was reasonable, and in at least one instance that four and a half years was reasonable. *See, e.g.*, *Sivananthan v. Blinken*, No. 23-cv-1181, 2023 WL 4885858, at *3 (D.D.C. Aug. 1, 2023) (finding a delay of under two years was not unreasonable); *Rezaei v. Garland*, No. 23-cv-1645, 2023 WL 5275121, at *3, *5 (D.D.C. Aug. 16, 2023) (same); *Pourshakouri v. Pompeo*, No. 20-cv-0402, 2021 WL 3552199, at *8–9 (D.D.C. Aug. 11, 2021) (finding delay of 44 months not unreasonable); *Akrayi v. Dep't of State*, No. 22-cv-1289, 2023 WL 2424600, at * 3 (D.D.C. Mar. 9, 2023) (finding a nearly three-year delay "falls comfortably within the range of reasonableness" under *TRAC*); *see also Da Costa*, 80 F.4th at 342 (finding a four year delay was not unreasonable because "[t]he period that Plaintiffs' petitions have been pending includes both the nine-month pause in statutory authorization and the serious practical challenges posed by a global pandemic . . . ."). Conversely, courts in this district have "generally found that immigration delays in excess of five, six, or seven years are unreasonable." *Sharifishourabi*, 2024 WL 3566226, at *7 (quoting *Ahmadi v. Scharpf*, No. 23-cv-953, 2024 WL 551542, at *5 (D.D.C. Feb. 12, 2024)).

Defendants' processing of immigrant visas appears to operate pursuant to a "rule of reason," and Applicant Plaintiffs have been waiting for theirs for under two years. This waiting period

falls within the timeframe this Court has repeatedly found to be reasonable to process immigrant visa applications. Thus, the first two *TRAC* factors weigh heavily in favor of Defendants.

### 2. *TRAC* Factor Four—Effect on Agency Prioritization

The fourth *TRAC* factor involves consideration of the agency's competing priorities. *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100. "Relief that would simply 'reorder' a queue of applicants seeking adjudication is generally viewed as inappropriate when 'no net gain' in such adjudications is achieved." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 149 (D.D.C. 2021) (quoting *Sarlak v. Pompeo*, No. 20-cv-35, 2020 WL 3082018, at *6 (D.D.C. June 10, 2020)). "This factor often carries significant weight." *Id.*

Defendants argue that prioritizing Applicant Plaintiffs' visa applications would be at the expense of others seeking immigrant visas. ECF No. 6 at 31. They note that in this Circuit, "a court will not compel agency action where the result would be merely to expedite the consideration of a plaintiff's application ahead of others." *Id.* (citing *Da Costa*, 80 F.4th at 344). Further, Defendants argue that even if the effect of "re-adjudicating only a single application . . . would not fundamentally augment the pace of considering other applications," the Court should find this factor weighs in Defendants' favor because the accumulation of such individual cases impacts agency priorities. *Id.* at 32 (quoting *Tate*, 513 F. Supp. 3d at 150 ("While the effect of an individual case would be minimal, the accumulation of such individual cases being pushed by judicial fiat to the front of the line would erode the ability of agencies to determine their priorities.") (citing *Da Costa*, 80 F.4th at 343 ("[M]oving Plaintiffs' petitions to the front of the line would disrupt competing agency priorities with no overall improvement in the USCIS backlog.")).

Plaintiffs argue that Defendants have not established that a queue exists or that applications are handled on a first-in-first-out basis. ECF No. 8 at 53. To support this argument, Plaintiffs

allege that they know "of other visa applicants who attended interviews after Applicant-Plaintiffs, were also placed in administrative processing, yet [have] already received final visa adjudica-tions."  ECF No. 1, ¶ 112; *see also* ECF No. 8 at 53.  Plaintiffs also argue that because Applicant Plaintiffs are seeking a visa based on a familial relationship, they "are the priority."  ECF No. 8 at 54 (quoting *Sunny v. Biden*, 573 F. Supp. 3d 759, 776 (E.D.N.Y. 2021) ("Congress wanted [immi-grant relative] visas to be prioritized.")).  As such, Plaintiffs urge the Court not to take at face value Defendants' "bold assertion" that expediting their applications would prioritize them at the ex-pense of others.  ECF No. 8 at 53–54.

But Defendants do not argue that the impact on agency priorities is based on a queue.  ECF No. 9 at 20–21.  Instead, they acknowledge that no formal queue exists for visa applicants that have received Section 221(g) refusals, but that agency priorities will be impacted regardless.  *Id.* ("Defendants have not maintained that a true queue of line exists for visa applicants in national security-related administrative processing. . . . [P]rocesses . . . necessarily proceed at a pace com-mensurate with further evaluating the basis for such a refusal . . .").  They argue that Section 221(g) refusals are subject to further processing on a discretionary basis and, specifically, that there are many factors that impact processing of applications refused under Section 221(g) on security- or terrorism-related grounds.  *Id.* at 21 (quoting ECF No. 1-6 at 5 (listing factors that impact pro-cessing, including "the extent of review and coordination required, the amount of derogatory in-formation, which other agencies have responsive information, the timing of when each partner agency completes its review")).  This is confirmed by the Wu declaration, as discussed above. ECF No. 1-6 at 5 ("Because of the complexity of this process, SAO requests can be neither ad-dressed nor resolved in a first-in-first-out basis.").

When considering whether a formal queue must exist for Defendants to prevail on this factor, the Court notes that other judges in this district have found that this factor weighs in favor of the government in cases involving Section 221(g) refusals. *See, e.g.*, *Shen v. Pompeo*, No. 20-cv-1263, 2021 WL 1246025, at *9 (D.D.C. Mar. 24, 2021) (finding factor four weighed in favor of the government in a 221(g) refusal case because "[c]ourts generally defer to the agency's 'unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way'" (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)); *see also Hajizadeh*, 2024 WL 3638336 ("[C]ompelling Secretary Blinken to process [the plaintiff's] visa application presents an individualized solution to a systemic problem and 'would presumably delay other adjudications.'" (quoting *Liu v. Blinken*, 544 F.Supp. 3d 1, 13 (D.D.C. 2021)); *Augustin v. Blinken*, No. 23-cv-76, 2023 WL 4547993, at *6 (D.D.C. July 14, 2023) (finding that this factor weighed in favor of the government when the "very premise of [plaintiff's request]" for "immediate[e]" processing rests on the argument "that there is a backlog of visa applicants and that [the plaintiff] should be prioritized for processing ahead of others" (quoting *Milligan v. Blinken*, No. 20-2631, 2021 WL 3931880, at *9 (D.D.C. Sept. 2, 2021)).

This is true even when no formal queue has been established by the defendant. *See, e.g.*, *Sharifishourabi*, 2024 WL 3566226, at *9 (acknowledging the lack of a formal line in the underlying administrative process but finding this factor favored the defendants); *Augustin*, 2023 WL 4547993, at *6 (dismissing the plaintiff's argument that the government had not established a formal queue as failing "grapple" with the fact that the plaintiff was requesting to be prioritized before others). In *Sharifishourabi*, a case in which the plaintiffs challenged a Section 221(g) refusal for unreasonable delay, the court acknowledged that "the underlying administrative process in this case (*i.e.*, conducting security investigations) [did] not appear to be addressed or resolved in a

first-in-first-out basis." *Sharifishourabi*, 2024 WL 3566226, at *9. Still, the court found this factor weighed in favor of the defendants because "compelling agency action on [the plaintiffs'] applications would 'impose offsetting burdens on equally worthy' applicants by effectively putting [the plaintiffs] 'at the head of the queue,' thereby 'mov[ing] all others back one space and produc[ing] no net gain." *Id.* (third and fourth alterations in original) (quoting *In re Barr Labs*, 930 F.2d at 73, 75). Further, the court reasoned, based on a declaration of Carson Wu provided by the plaintiffs, that "there are likely thousands of similarly situated applicants who have waited equally as long or longer." *Id.* The court found that granting the requested relief "would therefore 'necessarily come at the expense of similar situated applicants.'" *Id.* (quoting *Da Costa*, 80 F.4th at 340).

The facts here directly mirror those in *Sharifishourabi*; Applicant-Plaintiffs' visa applications were refused under INA 221(g), they were told their applications were subject to "administrative processing," and the specific method of processing—as explained by the Wu declaration—was not based on a first-in-first-out basis. *See* ECF No. 1-2 at 1; ECF No. 1, ¶¶ 6, 27, 28, 29, 100, 105, 107, 111–13; ECF No. 1-6 at 5. Still, the court there found that the factor weighed in the government's favor because a long line of reasoning exists in the D.C. Circuit warning against decisions by this court that would "require the State Department to 'reorder[] [its] priorities[.]'" *Sharifishourabi*, 2024 WL 3566226, at *8 (first two alterations in original) (quoting *In re Barr Labs*, 930 F.2d at 76). Finding those decisions persuasive, the Court similarly concludes that, although a first-in-first-out queue has not been established by Defendants, granting Plaintiffs' requested relief here would slow down the processing time for other applicants and would require the State Department to reorder its priorities. This factor weighs in favor of Defendants.

3.   *TRAC* Factors Three and Five—Interests at Issue

The third and fifth *TRAC* factors are also considered together—they overlap, analyzing "the impact on human health and welfare and economic harm, and the nature and extent of the interests prejudiced by the delay." *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 118 (D.D.C. 2005).  It is difficult for a plaintiff to succeed on these factors when his or her situation is not unique, as the court must consider "not just [the plaintiff's] health and welfare . . . , but also that of others similarly-situated."  *Pushkar v. Blinken*, No. 21-cv-2297, 2021 WL 4318116, at *9 (D.D.C. Sept 23, 2021); *see also Mohammad v. Blinken*, 548 F. Supp. 3d 159, 168–69 (D.D.C. 2021) ("But the Court is also mindful that 'many others' face similarly difficult circumstances as they await adjudication of their visa applications." (quoting *Palakuru v. Renaud*, 521 F. Supp. 3d 46, 53 (D.D.C. 2021)).

Plaintiffs allege that the delay in adjudication "has placed severe financial, psychological, and emotional strain" on them.  ECF No. 1, ¶ 12.  They argue that Plaintiff Applicants are at a higher risk of physical harm because they live in Iran, which is rated Level 4: Do Not Travel by the U.S. Department of State.  *Id.*, ¶ 114.  They allege that Plaintiff Shoaie would be at particular risk in Iran due to their ties to the U.S.  *Id.* ¶¶ 115–116.  They further allege that Applicant Plaintiffs are at an increased risk of physical danger because of their ties to Plaintiff Shoaie, a U.S. national. *Id.* ¶¶ 114-16.

The Court is not unsympathetic to the Plaintiffs' difficulties.  But the Court is also mindful that "many others face similar difficult circumstances as they await adjudication."  *Mohammed*, 548 F. Supp. 3d at 168–69.  Additionally, Plaintiffs' allegations of physical harm are generalized to the location where they live—all applicants from Iran seeking a family-sponsored immigrant visa will necessarily have ties to the United States, which may lead to an increased risk of physical

harm, as alleged here. *See Da Costa*, 80 F.4th at 345 (finding these factors did not favor plaintiffs when the alleged harms were generalized to the population of the city where they live and were not linked to the delayed visa adjudication). But Plaintiffs allegations of familial separation and emotional harm are relevant because the familial separation is impacted directly by the alleged delay in processing. *See Tate*, 513 F. Supp. 3d at 150 (finding this factor weighed slightly in the plaintiffs' favor when they had "been separated from friends, family, and loved ones"); *Augustin*, 2023 WL 4547993, at *5 (finding this factor weighed in the plaintiffs' favor when the delay also harms the plaintiffs' "U.S.-citizen child and sponsor for the visa"); *Giliana v. Blinken*, 596 F. Supp. 3d 13, 22 (D.D.C. 2022) (finding this factor in the plaintiffs favor when "delays force them to postpone their lives together"); *Milligan*, 2021 WL 3931880, at *8 (finding this factor in plaintiff's favor when "the delay in adjudicating . . . has forced [the plaintiffs] 'to endure a prolonged and indefinite separation from their fiancé(e)s'" (quoting *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 319 (D.D.C. 2020))).

Although Plaintiffs' allegations of harm based on living in Iran are generalized, the harms caused by familial separation, *see* ECF No. 8 at 56–57, tip this factor slightly in Plaintiffs' favor.

4. *TRAC* Factor Six—Bad Faith

The sixth *TRAC* factor teaches that a court may conclude that agency action is unreasonably delayed even without finding bad faith or impropriety on the part of the agency, while "the good faith of the agency in addressing the delay weighs against mandamus." *Liberty Fund*, 394 F. Supp. 2d at 120. Plaintiffs do not allege bad faith or impropriety in the Complaint. *See generally* ECF No. 1. But in their opposition to the motion to dismiss, Plaintiffs argue that Defendant's failure to identify actions taken to ensure the prompt adjudication of Plaintiffs' visa applications, as well as their failure to provide an estimated timeframe to completion could be taken as bad faith. *See* ECF

No. 8 at 57 (arguing that "[c]learly there have been no efforts made in *good faith* here"). The Court has not identified any evidence of bad faith here. This factor, then, is either neutral or weighs in the government's favor. *Compare, e.g.*, *Dastagir v. Blinken*, 557 F. Supp 3d 160, 168 (D.D.C. 2021) (finding the sixth factor neutral where there was no allegation of bad faith), *and Desai*, 2021 WL 1110737, at *8 (same), *with, e.g.*, *Tate*, 513 F. Supp. 3d at 150 (finding that a lack of bad faith weighs in favor of the government).

> 5.   Balancing of the *TRAC* factors weighs in favor of Defendants.

Considering the six *TRAC* factors in their totality leads to the conclusion that Plaintiffs have failed to state a claim for unreasonable delay. Both the first factor, which has been called the "most important," *In re Core Commc'ns*, 531 F.3d at 855, and the fourth, which the D.C. Circuit has at times treated as dispositive, *see Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100 (D.C. Cir. 2003), support Defendants' position. The Court recognizes the hardship that the delay here has caused Plaintiffs, but the two hardship factors alone cannot "tip the scales" when weighed against the other four factors. *Da Costa*, 80 F.4th at 344. The Court finds that Plaintiffs have not stated a sufficient claim for unreasonable delay, under either the APA or the Mandamus Act, and these claims will be dismissed (i.e., Counts I, II, and IV).

> **D.    Defendants Fail to Address Plaintiffs' Section 706(2) Claim**

In addition to Plaintiffs' claims of unreasonable delay, Count III of their complaint asserts a claim under Section 706(2) of the APA. *See* ECF No. 1, ¶¶ 166–171. This claim challenges Defendants' failure to issue the required number of family-sponsored preference category visas as arbitrary and capricious, an abuse of discretion, and in violation of law. *Id.*; *see* 5 U.S.C. § 706(2)(A) (allowing a reviewing court to "set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Defendants do not challenge this claim in their motion to dismiss, but instead focus entirely on Plaintiffs' unreasonable delay claims.  *See generally* ECF No. 6.  Accordingly, Count III will go forward.

## IV.    CONCLUSION

For the reasons discussed above, the Court will grant Defendants' motion to dismiss on the ground that Plaintiffs have failed to state a claim for unreasonable delay. The Court will dismiss Plaintiffs' claims of unreasonable delay—Counts I, II, and IV.  A separate Order will issue.

Date:   November 6, 2024

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE