**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **FARHAD SHOAIE,** *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>**MARCO RUBIO, Secretary of State,** *et al.*,<br><br>**Defendants.** | **Case No. 24-cv-1513 (GMH)** |

**MEMORANDUM OPINION**

Plaintiff Farhad Shoaie is a U.S. citizen and the petitioner of a Form I-130 *Petition for Alien Relative*, seeking a family preference immigration visa on behalf of their sibling, Faramarz Showaii,[1] Showaii's wife, Mashia Hashemi Shirazi, and the couple's two minor children, B.D.S. and R.S.S. (collectively, "Applicant Plaintiffs"), who are all citizens of Iran. Following an interview with the Consular Section of the U.S. Embassy in Ankara, Turkey, Applicant Plaintiffs were informed their application was refused under Section 221(g) of the Immigration and Nationality Act ("INA") and had been placed in administrative processing, where it remains as of the date of this Memorandum Opinion.

Plaintiffs sued under the Mandamus Act and the Administrative Procedure Act ("APA") to compel the adjudication of their visa applications and to require the government to issue all visas allotted by Congress for family preference immigration. The Court previously granted the government's motion to dismiss Counts I, II, and IV, which challenged the purported failure to adjudicate Plaintiffs' applications. Count III, challenging the government's alleged failure to issue

---

[1] The Court presumes the two siblings owe their last names' divergent spellings, taken here from the complaint, to the vagaries of transliteration.

the statutorily required number of family preference immigration visas, was not included in the government's prior motion and thus survived. The government now moves to dismiss Count III for lack of standing and failure to state a claim. Because visas are available to Plaintiffs should they be found eligible to receive them, the Court agrees that they lack standing to challenge the alleged under-issuance of family preference visas. Accordingly, the Court will dismiss Count III for lack of subject matter jurisdiction.[2]

## I.    BACKGROUND

### A.    Statutory and Regulatory Background

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, authorizes consular offices to issue immigrant visas to foreign nationals seeking to enter the United States. *See* 8 U.S.C. § 1201; 22 C.F.R. § 42.71. The INA creates three categories of immigrant visas: family preference, employment-based, and diversity. *See* 8 U.S.C. § 1151(a)(1)–(3). In family preference applications, U.S. citizens and lawful permanent residents may petition for visas on behalf of their foreign national relatives who wish to take up residency here. *See id.* § 1153(a). In employment-based applications, prospective employers may petition for visas on behalf of foreign national workers to satisfy demands not met by the domestic labor market and foreign national investors may petition for visas to immigrate to the United States with the intention to create jobs for domestic workers. *See id.* § 1153(b). Diversity-based immigration is a lottery system in which visas are numerically apportioned by country and randomly awarded among each country's pool of eligible applicants. *See* 22 C.F.R. § 42.33(c).

---

[2] The docket entries relevant to this Memorandum Opinion and Order are (1) the Complaint, ECF No. 1; (2) the Court's prior Memorandum Opinion and Order dismissing Counts I, II, and IV, ECF Nos. 11–12; (3) Defendants' motion to dismiss Count III, ECF No. 21; (4) Plaintiffs' opposition, ECF No. 23; and (5) Defendants' reply, ECF No. 27. Page numbers cited herein are those assigned by the Court's CM/ECF system.

The INA sets the formulae for determining how many of each type of visa shall be issued each year. *See* 8 U.S.C. § 1151(c)–(d). That includes a floor and a ceiling for family presence visas: the government must make at least 226,000 but no more than 480,000 family preference visas available each year. *Id.* § 1151(c)(1)(A). Family preference visas are in turn separated into four subcategories, the last of which is for siblings of U.S. citizens. *Id.* § 1153(a)(1)–(4). Any visas allotted but not used for family preference immigration in a given year become available for employment-based immigration in the following year. *Id.* § 1151(d)(2)(C).

The application process for a family preference visa begins with the submission of Form I-130 *Petition for Alien Relative* to the U.S. Citizenship and Immigration Services ("USCIS") by a citizen or lawful permanent resident of the United States. *See Form I-130, Petition for Alien Relative* (Oct. 23, 2024), https://www.uscis.gov/i-130 [https://perma.cc/M57W-Z8V2]. The filing date of the Form I-130 serves as the applicant's "priority date," which establishes the applicant's place in the line for available visas. 22 C.F.R. § 42.53(a); *see also* U.S. Citizenship and Immigr. Servs., *Visa Availability and Priority Dates* (Jan. 24, 2025), https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-and-priority-dates [https://perma.cc/BNQ3-E6JP]. The foreign national relative and any accompanying family members must then submit visa applications, either via Form DS-230, *Application for Immigrant Visa and Alien Registration*, or Form DS-260, *Electronic Application for Immigrant Visa and Alien Registration*. 22 C.F.R. § 42.63(a)(1). Applicants must also pay a processing fee and submit supporting documents. 9 Foreign Affs. Manual ("FAM") 504.1-2(b)(2). On completion of the applications, payment of processing fees, and submission of supporting documents, the petition is considered "documentarily complete." *Id.*

Once the application is documentarily complete, the applicant must wait for an Immigrant Visa number ("IV number") to be assigned based on their priority date. *See* 9 FAM 504.1-2(c). To maintain "the numerical limitations on immigration specified in [the] INA," the government "limit[s] the number of immigrant visas that may be issued." 22 C.F.R. § 42.51(a). Within those "limitations," the government "allocate[s] immigrant visa numbers for use in connection with the issuance of immigrant visas." *Id.* § 42.51(b); *see also* 9 FAM 504.1-2(c). In other words, the government issues a finite number of IV numbers based on the estimated number of visas they will issue to applicants ultimately found eligible. *See* 9 FAM 504.1-2(c). When "demand exceeds the supply of available numbers," it awards the available IV numbers to those applicants with the earliest priority date who have not already received an IV number, moving up the list chronologically until it runs out of IV numbers. 9 FAM 504.1-2(c); *see also* 22 C.F.R. § 42.51(b); *Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 335 (D.C. Cir. 2023) (outlining this "first-in, first-out" system).

When the government reaches an applicant's priority date and awards an IV number, that priority date becomes "current." U.S. Citizenship and Immigr. Servs., *Consular Processing* (July 20, 2023), https://www.uscis.gov/green-card/green-card-processes-and-procedures/consular-processing [https://perma.cc/GJ8R-HS95]. In other words, a "current" priority date means that an "immigrant visa is considered available" for the applicant. 8 C.F.R. § 245.1(g)(1). The earliest priority date for which an IV number is *not* available (i.e., the priority date of the first applicant not to receive an IV number) becomes the "final action date." 9 FAM 504.1–2(c). This process repeats every month. *Id.* And every month, the Department of State publishes a Visa Bulletin tabulating "current" priority dates according to visa category and country of origin. *Da Costa*, 80 F.4th at 335; *see, e.g.*, U.S. Dep't of State, *Visa Bulletin*, Vol. XI, No. 13 (Apr. 2026). Once an

4

applicant is assigned an IV number based on their priority date (i.e., their application is "current"), they are scheduled for an interview with a consulate. FAM 504.1-2(d)(1).

In plain(er) English, the visa allocation system works a bit like the take-a-ticket system at a deli. An applicant for a visa is given a "priority date," which is the "filing date" of their application. *See* 22 C.F.R. § 42.53(a). The "priority date" is like the ticket at the deli in that it marks "the applicant's place in the queue" for a visa. *Barbaria v. Blinken*, 87 F.4th 963, 974 (9th Cir. 2023). Once the application is "documentarily complete," the applicant may take their spot in the queue (or in line in the deli, to keep the analogy going). *See* 9 FAM 504.1-2(b); *see also iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 61 (D.C. Cir. 2021) (explaining that an applicant with a complete application "is eligible to stand in line for an immigrant visa number"). And much like at a busy deli, demand for visas often outstrips supply. *See* 22 C.F.R. § 42.51(a)–(b). So the government allots IV numbers "to the extent available visa numbers permit" to those with the earliest "priority date"—in the deli analogy, the lowest ticket number—who have not already received an IV number. 9 FAM 504.1-2(c); *see also* 22 C.F.R. § 42.51(b). Eventually, the government reaches the applicant's priority date, which is like the deli counter calling your ticket number—only instead of ordering a sandwich, you get an IV number and the opportunity to interview for an available visa. *See* 8 C.F.R. § 245.1(g)(1); 9 FAM 504.1-2(c); *see also* 22 C.F.R. § 42.51(b). This process repeats every month, with the government moving up the list of "priority dates" like the deli moves up the ticket numbers. *See* 9 FAM 504.1-2(c).

The key takeaway is this: When an applicant's priority date becomes current, an IV number is assigned, and an interview is scheduled, the government has determined that a visa is "available" to them should they be found eligible to receive it. *See* 8 C.F.R. § 245.1(g)(1) ("A preference immigrant visa is considered available for accepting and processing if the applicant has a priority

date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current)."); 9 FAM § 504.1-2(d)(1); *Barbaria*, 87 F.4th at 974 (explaining that "the State Department projects that a visa will be immediately available to any immigrant with a priority date earlier than the published final action date").

Based on the applicant's representations in the executed visa application and during the interview, the consular officer determines "[t]he applicant's eligibility to receive a visa," 22 C.F.R. § 42.62(b)(1)(ii), and "must either issue the visa or refuse it."  9 FAM § 504.9-2.  Although the consular officer "cannot temporarily refuse, suspend . . . or hold the visa for future action" after the interview, 9 FAM § 504.9-2, if the officer determines that "additional information from sources other than the applicant may help establish an applicant's eligibility for a visa," he or she "may 'refuse' the visa pending 'further administrative processing' pursuant to Section 221(g) of the INA." *Datta v. Rubio,* No. 24-cv-937, 2025 WL 752643, at *1 (D.D.C. March 10, 2025) (quoting U.S. Dep't of State, Admin. Processing Info., https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/administrative-processing-information.html  [https://perma.cc/4 4NK-RVZE]).  A refusal subject to administrative processing may be "overcome" if "the applicant has presented additional evidence" demonstrating eligibility for the visa.  9 FAM § 504.11-4.  That said, according to the FAM, "[a] refusal under INA 221(g) is, legally, a refusal on the visa application, even if that refusal is eventually overcome."  9 FAM § 302.1-8(B)(c).

**B.     Factual and Procedural Background**

The following facts are drawn from the well-pleaded allegations in Plaintiff's complaint, which the Court "must accept . . . as true" when evaluating a motion to dismiss.  *See Vera Inst. of Just. v. U.S. Dep't of Just.*, 805 F. Supp. 3d 12, 23 (D.D.C. 2025).

Applicant Plaintiffs, citizens of Iran, seek to immigrate to the United States on a family preference visa. ECF No. 1 at 10. On August 23, 2006, Plaintiff Shoaie filed a Form I-130 on behalf of Applicant Plaintiffs. *Id.* at 4. USCIS approved the petition on December 9, 2010, and subsequently forwarded their case to the National Visa Center ("NVC"). *Id.* On May 6, 2019, Applicant Plaintiffs paid the required filing fees and submitted Form DS-260 to the NVC, along with supporting documentation. *Id.* Applicant Plaintiffs' priority date became current in August 2019. *Id.* at 23.

On July 20, 2020, Applicant Plaintiffs received notification from the NVC that their application was documentarily complete, and they were thus eligible to schedule a consular interview. *Id.* On January 19, 2023, Applicant Plaintiffs were interviewed by the Consular Section of the U.S. Embassy in Ankara, Turkey. *Id.* After the interview, Applicant Plaintiffs were informed that their application was refused under Section 221(g) and placed in administrative processing. ECF No. 1-2 at 1. On January 23, 2023, the consular officer asked Applicant Plaintiffs to submit additional information, which they did on February 6, 2023. ECF No. 1 at 24. Applicant Plaintiffs' application remains in administrative processing to date. ECF No. 23 at 10; *see also* ECF No. 1-1 at 1.

Separately, Plaintiffs allege that the number of family preference visas issued by the government has fallen below the floor set by the INA. From FY 2019–2023, the total annual number of available visas allotted for family preference immigration was set at the statutory minimum of 226,000. ECF No. 1 at 21. During each of those years, the number of visas actually issued for family preference immigration fell short of the available total, ranging from a high of 194,419 in 2023 to a low of 63,858 in 2021. ECF No. 1-3 at 1. Ultimately, a total of 696,450 visas were issued for family preference immigration for this five-year period, out of 1,130,000 allotted

7

for that purpose. *Id.* As a result, over this five-year period, a total of 433,550 visas originally allotted for family preference immigration rolled over for use in employment-based immigration.[3] ECF No. 1 at 22.

On May 22, 2024, Plaintiffs sued Defendants Antony Blinken, in his official capacity as U.S. Secretary of State, and Carson Wu, in his official capacity as Acting Director of the Office of Screening, Analysis, and Coordination within the Department of State. ECF No. 1 at 1.[4] Plaintiffs alleged four causes of action arising under the Mandamus Act, 28 U.S.C. § 1361, and the APA, 5 U.S.C. §§ 555(b), 706(1), 706(2). Those causes of action can be sorted into two groups: first, those claiming that Defendants unreasonably delayed adjudication of their visa applications (Counts I, II, and IV), and second, that Defendants failed to issue all visas allotted for family preference immigration for FY 2018–2023 in violation of the law (Count III). ECF No. 1 at 33–40. For the first set of claims, Plaintiffs request declaratory and injunctive relief requiring Defendants to adjudicate their visa applications. *Id.* at 41–42. And for the second, Plaintiffs seek declaratory and injunctive relief compelling Defendants to issue the statutorily required number of family preference visas. *Id.* at 42.

On November 6, 2024, upon the government's motion, the Court dismissed Counts I, II, and IV of the Complaint, on the ground that Plaintiffs failed to state a claim for unreasonable delay of the adjudication of their applications. ECF No. 11 at 30. Count III of the complaint was not included in the government's motion at that time and thus survived. *Id.* at 30–31. The government

---

[3] Plaintiffs allege that the total number of rolled-over visas was "about 437,327" for FY 2018–2023, but they do not expressly state the number of family preference visas issued for FY 2018, nor are statistics for that year included in their supporting exhibits. ECF No. 1 at 22; *see* ECF No. 1-3 at 1. Whether the interval at issue begins with FY 2018 or 2019 is ultimately immaterial to the Court's analysis of Plaintiffs' claims.

[4] Robert Jachim was substituted for Carson Wu as a defendant in his official capacity as Acting Director of Screening, Analysis and Coordination. Minute Order (Aug. 26, 2024). Marco Rubio was automatically substituted as a defendant for Antony Blinken in his official capacity as Secretary of State. Fed. R. Civ. P. 25(d).

now addresses its prior omission and moves to dismiss Count III for lack of standing and failure to state a claim.[5]   ECF No. 21 at 6.   Specifically, the government argues that Plaintiffs' alleged injury is not traceable to the challenged action and would not be redressed by the relief requested.[6] *Id.* at 9–10.

## II.   LEGAL STANDARD

Because standing is a constitutional limit on the power of federal courts, the "[l]ack of standing is a defect in subject-matter jurisdiction." *Sabra ex rel. Baby M v. Pompeo*, 453 F. Supp. 3d 291, 309 (D.D.C. 2020).   "When a court lacks subject-matter jurisdiction, it has no authority to address the dispute presented." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 624 (D.C. Cir. 2017).   "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

As the parties invoking the Court's jurisdiction, Plaintiffs bear the burden of establishing that jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *Wonders v. Dep't of the Army Off. of Gen. Couns.*, 749 F. Supp. 3d 122, 128 (D.D.C. 2024).   At the pleading stage, they must "plausibly 'allege facts demonstrating'" each element of standing. *Coubaly v.*

---

[5] A party's standing, as a prerequisite of subject-matter jurisdiction, may be challenged during any stage of a proceeding, including in a second motion to dismiss. Fed. R. Civ. P. 12(g)(2), (h)(3).

[6] Relying on a 2025 Executive Order, Plaintiffs contend that the government's counsel "have been stripped of the authority to opine about what the law is, and the arguments contained in their motion are thus void." ECF No. 23 at 21.   Plaintiffs misread that Order at least twice over.   Far from stripping government counsel of the authority to make legal arguments on behalf of the government, that Executive Order merely prohibits Executive Branch employees from "advanc[ing] an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." Exec. Order. No. 14215, 90 Fed. Reg. 10447, 10448–49.   Even accepting Plaintiffs' contention that the Order applies here, Plaintiffs nowhere identify any opinion of the President or the Attorney General contrary to those advanced by the government's counsel in this case.   And in any event, the Order includes the familiar disclaimer that it "does not[] create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents." *Id.* at 10449.   As another court in this Circuit has recognized, it is therefore not a means for plaintiffs to exclude the government's arguments from the Court's consideration. *Morrison v. Noem*, 24-cv-1765, 2025 WL 2651247, at *2 n.3 (D.D.C. Sep. 16, 2025).

*Cargill Inc.*, 144 F.4th 343, 348 (D.C. Cir. 2025) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  "[T]he Court must construe the complaint in plaintiffs' favor and treat all well-pleaded factual allegations as true," as well as "grant plaintiffs the benefit of all reasonable inferences." *Bailey v. Fed. Bureau of Prisons*, 780 F. Supp. 3d 96, 113 (D.D.C. 2025); *see Black Lives Matter D.C. v. United States*, 775 F. Supp. 3d 241, 253 (D.D.C. 2025).  And the Court must "assume that the party asserting federal jurisdiction is correct on the legal merits of his claim." *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

### III.    DISCUSSION

Standing arises from the Constitution's limitation of the "judicial Power of the United States" to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  The doctrine serves to prevent the federal judiciary from encroaching on the powers of the political branches of government by ensuring that it decides only genuine disputes and not abstract or hypothetical policy questions. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).  To establish standing at the pleading stage, a plaintiff must plausibly allege an injury in fact that is traceable to the conduct of the defendant and redressable by the court.  *Spokeo, Inc.*, 578 U.S. at 338.  For the following reasons, the Court agrees with the government that Plaintiffs have failed to plausibly allege causation and redressability.

Although the government does not challenge Plaintiffs' injury in fact, the Court must "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005) (quoting *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987)).  An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 578 U.S. at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  A concrete and particularized injury is

distinguished from one in which a plaintiff "suffers in some indefinite way in common with people generally." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)). A plaintiff therefore must allege more than an undifferentiated "interest, common among all citizens, in the government following the law." *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 128 (D.D.C. 2013).

Here, Plaintiffs plausibly allege that the post-interview delay they suffer while their application is in "administrative processing" inflicts an injury in fact. ECF No. 1 at 9. They allege both economic harms—the extra expense incurred pursuing their visa applications through additional processing—and noneconomic harms—the emotional toll taken by the prolonged separation of the two siblings. *See id.* at 27. Plaintiffs' "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellin*, 594 U.S. 220, 243 (2021); *see also Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017) ("A dollar of economic harm is still an injury-in-fact for standing purposes."). And plaintiffs "suffer[] a concrete harm due to the separation from [their] family in the United States." *Pourabdollah v. Blinken*, No. 23-cv-1603, 2024 WL 474523, at *3 (D.D.C. Feb. 7, 2024). Accordingly, Plaintiffs have sufficiently alleged an injury in fact arising from the post-interview delay of their visa application.

On traceability and redressability, however, the Court concludes that Plaintiffs' allegations fall short. Traceability and redressability "are usually 'flip sides of the same coin.'" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024)). Traceability requires that the plaintiff's injury in fact be "fairly traceable to the defendant's allegedly unlawful conduct." *California v. Texas*, 593 U.S. 659, 668–69 (2021). Here, that means Plaintiffs' injury in fact must be traceable to Defendants alleged failure to "issue the Congressionally allotted number of Family Sponsored Preference category visas." ECF No. 1 at

38.  Similarly, redressability requires that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Ritghs Org.*, 426 U.S. 26, 38 (1976)).  That means the injury Plaintiffs allege must be redressed by the relief they seek, namely, declaratory and injunctive relief compelling the government "to issue the annual allotment of Family-Sponsored Preference category visas."  ECF No. 1 at 42.

Several courts to have considered claims similar to Plaintiffs'—challenges to the alleged under-issuance of family preference visas brought by plaintiffs whose visa applications were refused after an interview and placed in administrative processing—have held that those plaintiffs failed to show causation and redressability.  *See Diakanua v. Rubio*, No. 24-cv-1027, 2025 WL 958271, at *10 (D.D.C. Mar. 31, 2025); *see also Jazi v. Rubio*, No. 25-cv-27, 2025 WL 2420690, at *1 (S.D. Cal. Aug. 20, 2025); *Mirbod v. Blinken*, No. 24-cv-1430, 2025 WL 418518, at *5 (S.D. Cal. Feb. 6, 2025);.  The logic of these cases is straightforward and rests on the operation of the visa application process outlined above.  *See* Section I.A, *supra*.  As Plaintiffs appear to concede, ECF No. 1 at 14, an applicant cannot be scheduled for an interview before their priority date becomes current and they are assigned an IV number.  *Diakanua*, 2025 WL 958271, at *10; *see* 22 C.F.R. § 42.51(a)–(b).  That "means 'an immigrant visa is immediately available'" to them.  *Diakanua*, 2025 WL 958271, at *10 (quoting *Barbaria*, 87 F.4th at 974); *see also* Section I.A, *supra*.  Any injury arising from *post*-interview delay in issuing a visa therefore could not have been caused by a shortage of visas, because a visa *was* available to them.  *See Diakanua*, 2025 WL 958271, at *10; *Mirbod*, 2025 WL 418518, at *5.  Nor, for the same reason, would a judicial order to issue the statutorily required number of visas redress any *post*-interview delay—a visa is *already* available to them, so issuing more would have no effect on their time spent in administrative

processing. *See Jazi*, 2025 WL 2420690, at \*1; *Diakanua*, 2025 WL 958271, at \*10; *Mirbod*, 2025 WL 418518, at \*5;; *see also Ghalambor v. Blinken*, No. CV 23-9377, 2024 WL 2889868, at \*7 (C.D. Cal. Apr. 25, 2024) (finding that the plaintiff's claims were not redressable because a visa was "available," meaning the plaintiff's injury did "not arise from the unavailability of an FP visa"), *appeal dismissed sub nom. Ghalambor v. Rubio*, No. 24-3696, 2025 WL 1675934 (9th Cir. May 9, 2025)).

For the same reasons, Plaintiffs here cannot allege causation and redressability. Plaintiffs' application became "current per the August 2019 Visa Bulletin" and they underwent a consular interview in January 2023. ECF No. 1 at 23. That means a visa was (and remains) "available" to them should they be found eligible to receive it. *See* 8 C.F.R. § 245.1(g)(1); *see also* Section I.A, *supra*. They allege that, after their interview, their application was "placed in administrative processing, where it has remained." ECF No. 1 at 5. As explained above, Plaintiffs' injury in fact arises from the delay they suffer while their application languishes in administrative processing. But they could not have made it to that point in the process—*post*-interview administrative processing—without a visa available to them. *See* Section I.A, *supra*; *Diakanua*, 2025 WL 958271, at \*10; *Ghalambor*, 2024 WL 2889868, at \*7. So an injury that results from *post*-interview administrative processing is not traceable to the under-issuance, and resulting unavailability, of family preference visas, because a visa *was* available to them. *See Diakanua*, 2025 WL 958271, at \*10; *Mirbod*, 2025 WL 418518, at \*5. Nor would issuing the required number of visas redress their injury—again, because they already have a visa available to them. *See Diakanua*, 2025 WL 958271, at \*10; *Ghalambor*, 2024 WL 2889868, at \*7.

Recall the deli analogy. The visa application process is the take-a-ticket system at the deli and the visa is the sandwich. Assume the deli will call a ticket number only when it has a sandwich

available. *See* Section I.A, *supra*. To simplify Plaintiffs' claims somewhat to fit the analogy, they claim that the deli is not making the number of sandwiches they promised to make, meaning hungry patrons must wait longer for their ticket number to be called. *See* ECF No. 1 at 21–22, 37–38. But Plaintiffs' ticket number was already called. *See* ECF No. 1 at 23. That means a sandwich is available for them. *See* pp. Section I.A, *supra*. Nevertheless, the deli refused to serve them that sandwich and placed them in "delicatessen processing" (the analogy admittedly breaks down here). *See* ECF No. 1 at 23; ECF No. 1-2 at 1. They now challenge the deli's failure to make enough sandwiches and ask the Court to order the deli to make more. *See* ECF No. 1 at 37–38, 42. Their injury in fact is the delay in receiving a sandwich after the deli refused to serve them when their ticket number was called. But because their ticket number was called, a sandwich is available for them. So the delay they suffer from the deli's refusal to serve them was not *caused* by the deli's failure to make enough sandwiches. Nor would making more sandwiches *redress* that injury because the deli has refused to serve Plaintiffs the sandwich that is available.

In other words, Plaintiffs' injury arises from the determination that they are not eligible for a visa, not from the limited number of visas being issued. Although they may ultimate be awarded a visa once the government completes its administrative processing, that outcome depends on whether the government finds them eligible to receive it. *See* 22 C.F.R. § 42.81(e); *see also* 9 FAM § 504.11-4(A)(a) ("You should find that an applicant has overcome [a refusal] under INA 221(g) in two instances: when the applicant has presented additional evidence, allowing you to re-open and re-adjudicate the case, or when the case required additional administrative processing, which has been completed."). Even if the government were to issue all available family preference visas, it would not change the fact that Plaintiffs are presently deemed ineligible to receive them—their applications have been "refused." ECF No. 1-2 at 1. The refusal of Plaintiffs' applications may

change in the future, or it may not—but neither outcome depends on the number of visas issued. Accordingly, they lack standing to challenge the alleged under-issuance of visas.

Seeking to avoid that result, Plaintiffs argue that the under-issuance of family preference visas during the years in question resulted from specific guidance to consular offices to deprioritize scheduling interviews for family preference applicants. ECF No. 23 at 25–26. Since a visa cannot be issued without a consular interview, Plaintiffs argue that limiting the interviews available to family preference applicants would tend to limit the number of visas issued to them. *See id*. But even if the Court were to agree with Plaintiffs' interpretation of the State Department communications they cite,[7] the fact remains that Plaintiffs have already received an interview. ECF No. 1 at 5. Because they already received an interview, any judicial order that had the effect of shortening the waiting period for an interview would not redress the injury they suffer as a result of the *post*-interview processing of their application. And to the extent they rely on the delay they endured waiting for their interview, that past harm does not entitle them to the prospective relief they seek. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 250 (D.D.C. 2018) ("In a suit for injunctive relief, 'past harm is not sufficient to establish an injury in fact.'" (quoting *Nat'l Whistleblower Ctr. v. HHS*, 839 F. Supp. 2d 40, 45–46 (D.D.C. 2012)).

Finally, Plaintiffs note that their visa availability dates could retrogress. ECF No. 23 at 24. Visa "retrogression" occurs when the government issues more visas that it anticipated when it determined which priority dates were current, causing the final action date to move backwards in

---

[7] What Plaintiffs appear to take as statements of official disfavor toward family preference applications might instead be characterized as frank acknowledgments of limitations on consular resources. *See* ECF No. 23-1 at 1 ("Posts should continue to prioritize services to U.S. citizens," and after doing so, "should continue to maximize their resources to schedule as many family-based IV [immigrant visa] and [fiancé] NIV [nonimmigrant visa] appointments as possible . . . ."); ECF No. 23-2 at 1 ("After ensuring there are no ACS [American Citizens Services] backlogs and adequate ACS appointments are available, immigrant visa (IV)-processing posts should maximize their resources to accommodate as many family-based IV and [fiancé] NIV appointments as possible . . . .").

15

time, meaning a priority date that was current when an applicant was interviewed is not current when their application is adjudicated.[8]  Were that to occur, Plaintiffs would have to wait until their priority date again became current to receive a visa.  *See* ECF No. 23 at 24.  And issuing more visas would redress their injury, they contend, by shortening that waiting period.  *See id*.  But this argument relies on a different injury in fact: the hypothetical delay they may suffer waiting for their priority date to become current if retrogression occurs at some point in the future.  Plaintiffs make no allegations about the likelihood of retrogression, let alone showing (as they must) that it is "certainly impending" or there is "a substantial risk that [it] will occur."  *See Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021).  Such "a 'speculative' possibility of future injury does not suffice."  *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C. Cir. 2022) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).  Nor does the fact that the Court could redress a *different* injury not yet suffered by Plaintiffs make Plaintiffs' actual injury redressable, because the remedy must be "tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).[9]

At bottom, the fact that Plaintiffs have suffered *an injury* does not give them *carte blanche* "to complain of *all* administrative deficiencies," least of all those bearing no relation to that injury. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).  Plaintiffs have standing to challenge (and, in fact, did challenge) the allegedly unreasonable delay in adjudicating their applications after they were interviewed.  *See* ECF No. 11 (dismissing that challenge for failure to state a claim).  "But standing is not dispensed in gross."  *Lewis*, 518 U.S. at 358 n.6.  And because Plaintiffs have a visa available to them should they be found eligible to receive it, their injury—*post*-interview delay—

---

[8] *See Visa Retrogression*, USCIS, https://www.uscis.gov/green-card/green-card-processes-and-procedures/visa-availability-priority-dates/visa-retrogression [https://perma.cc/W822-XJ9A].

[9] The Court notes, moreover, that in the latest Visa Bulletin, the final action date for the type of visa Plaintiffs seek is June 8, 2008.  *See* U.S. Dep't of State, *Visa Bulletin*, Vol. XI, No. 13, at 2 (Apr. 2026).  That is nearly two years ahead of Plaintiffs' August 23, 2006, priority date.  ECF No. 1 at 23.  That means the final action date would need to retrogress by almost two years for it to affect Plaintiffs.

is not traceable to the conduct they challenge—the alleged under-issuance of visas—nor would it be redressed by the relief they seek—an order compelling the issuance of additional visas. Accordingly, Plaintiffs lack standing to challenge the alleged under-issuance of family preference visas. Because that is Plaintiffs' only remaining claim, this matter will be dismissed for lack of subject matter jurisdiction. *See Attias*, 865 F.3d at 624.

## IV.    CONCLUSION

For those reasons, the Court hereby grants Defendants' motion to dismiss for lack of subject matter jurisdiction, ECF No. 21. A separate Order will issue.


Date:    April 28, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE